Thank you, Your Honor, and may it please the Court, this is one of three cases the Court will hear this morning about this central question. Was there a seizure under the Fourth Amendment in this case? That is the only question the panel needs to answer in this case. Everything else can be remanded. There was a seizure in this case for two independently sufficient reasons. There was a use of deadly force against Mr. Hollamon by firing a pepper ball bullet, three pepper ball bullets at his head. And there was also an intent to restrain under the intent to restrain test because of the facts here show an objectively, an objective intent to restrain. The Court must reach and resolve this Fourth Amendment question to resolve the official capacity claim in this case. And, in fact, to the degree the appellees raise other Monell-based offenses, those were not the basis for the motion for summary judgment below. And so they're not an appropriate basis on which to affirm the grant of summary judgment. So the Court must reach and resolve the Fourth Amendment claim because that was the basis on which the summary judgment motion was made, and it was the only question resolved by the Court below. So is it your position that a seizure occurs any time a law enforcement officer fires a projectile in a manner that could cause serious injury? Yes, Your Honor. I mean, we think that it's the deadly force standard, so it would be a substantial risk of death or serious bodily harm. Regardless of intent? Regardless of intent. How does that square with Torres? So Torres is not — is a case about sufficiency, what is sufficient to show restraint. But the Supreme Court has announced multifarious tests for Fourth Amendment seizure. Obviously, we have the show-of-authority cases that use a completely different method of establishing a seizure. So, you know, there is an assertion of lawful authority and a submission to that authority necessary in the show-of-authority cases. So what is the current status, then, of the concept of altering or restraining a person's freedom of movement after Torres? So there's a — there's a substantial body of cases that will not rise to the level of deadly force, but will come in under the intent-to-restrain standard. You can imagine just an officer pulling a person's arms back or tackling them. It's not going to rise to the level of deadly force, but it shows a clear intent to restrain. If then the person wiggles away and gets away, there was still a seizure in that case because of the intent to restrain and the infliction. So if there's some kind of incidental harm, you break their finger while you do the tackling, you're going to then have a seizure. Now, I want to emphasize, getting to a seizure is table stakes in these cases. The question then becomes, was it a reasonable use of force? Most officers are going to prevail on that second prong. But at the moment, in this circuit, we don't get to that step of the analysis in many cases in which significant lethal force is used against individuals. The current state of affairs in this circuit is that if officers fire very dangerous projectiles indiscriminately into a crowd and someone is struck, that would not constitute a seizure. So we think that is wrong. We think that if a person is struck by one of these serious projectiles, that is a seizure. We think that that's what the Ninth Circuit held in the Nelson case. Is your theory on that, which is of your two theories, because that's an intent to restrain or because they're hit in a way that reflected a use of deadly force? You know, it might actually be a thin line between the two. There is a way of getting there under the intent to restrain test, but it requires you to go through a bunch of hoops. So you would say, well, no one would fire such a lethal weapon indiscriminately into a crowd unless whoever they struck, they wanted to sort of fall prone on the ground. So that's a lethal. So firearm. Certainly a firearm. But with the rubber billet, the pepper ball indiscriminately into the crowd, which theory are you going with there? I mean, so in the Packard case in the Tenth Circuit, they used intent to restrain in that very situation. So it's an indiscriminate beanbag rounds into a crowd with intent to disperse. Person is struck in the eye above the orbital socket. And the court in a footnote says, we find it hard to imagine that this is not a restrain or a seizure under the Fourth Amendment. But to get there, and then they cite Torres v. Madrid. I mean, to get there, you have to make certain inferences about what it means to use that level of force. So it would be a beanbag round is such a dangerous weapon. If I fire it into a crowd, I must intend to restrain whoever I hit with it. Deadly force might be the more direct method and probably is the better method. The Supreme Court and this Court have held categorically deadly force is a seizure for Fourth Amendment purposes. And then the question just becomes, is it, does it pose a risk of death or serious bodily harm? And I'd like to just point out that the amicus brief from the ACLU in this case catalogs some statistics about the dangerousness of these projectile kinetic weapons. Counsel, we're talking law here. Yes, Your Honor. So come back to the law with me a second. What is your best Eighth Circuit authority that use of the pepper ball is deadly force? Well, so I think it's the general proposition that deadly force is a seizure. So you have very clear statements of that proposition. I don't have a case for you that says that the use of a pepper ball gun or is in fact deadly force. That is actually what we think is obviously deadly force, so you could get there under the obvious prong of qualified immunity. But even if you disagree with me about that, we think this would be the case to establish that this rises to the level of deadly force sufficient to constitute a seizure per se under the deadly force case. Counsel, let's go ahead. No, you go ahead. Let's suppose there is a seizure here. Why is it unreasonable? We have what seems to be sort of a paramilitary operation going on. There's a construction site being assaulted by people in camo, you know, advancing toward officers over fences. Why is it unreasonable? So, Your Honor, I mean, the visual of this case looks threatening. But when you start to break down what actually happened, and the Court, of course, has the video of what was happening, and you understand the context of what these protesters were attempting to do. They were attempting to go get through this no man's land. They knew that they would be subject to pepper spray, tear gas, and various things, so they put on this protective gear. But their intent, and this certainly the facts viewed in the light most favorable to us, their intent was to go and lock themselves to equipment in an act of civil disobedience. They were not the officers had experience with these protesters. They were not there to cause anyone injury. They were not carrying weapons. They were carrying devices that you use to lock yourself to things. And their intent was to be as frustrating and as sort of annoying as possible. Well, the illegal. Yes, and they were breaking the law. Yeah, at every relevant time. Go ahead. And so they were, you know, gross misdemeanor, trespass, and all the rest. Right. And they were expecting to be arrested and prosecuted as a result of that. And, you know, our position on this is that that level of crime is so minor that you arrest the person and you prosecute them for the misconduct. And, in fact, to use such dangerous force simply to protect property or prevent the need to sort of cut them off of the equipment actually subverts the legislative judgment that's made in those criminal statutes about what the level of culpability is for these crimes. We can increase that. I'd like to ask you a little bit about your other theory, the intent to restrain. Yes, Your Honor. Because this one, just based on the facts that you've described, is a little different than some of the other protests where there's sort of a mass of people. Maybe it's night, maybe it's not. You've described sort of more of a predictable movement of people. The video sort of shows officers are, you know, kind of standing and watching and just there's sort of phases of the movement. And I'm wondering whether that plays any role into the intent to restrain here if what we're doing is contrasting that to an intent to disperse. And I'd just like you to speak to that a little bit, if there's something about the conduct here that leans it more toward intent to restrain once you've narrowed down the, you know, dozen or so folks that have remained. I mean, you do have context factors here that are not present in a sort of street protest scenario. So every person in the no man's land has already engaged in trespass. So you have unlawful, concerted conduct by a group of individuals. You have officers yelling that if you enter the no man's land, you will be under arrest. Eventually, they do arrest them. And my client, you know, says that he lost consciousness as a result of the force that was used. And so there was some level of, we are going to gather these people up if we can get them. And certainly if they remain, we're going to move them out of here. So, you know, it was inevitable once you got into that no man's land that you would be apprehended if you didn't voluntarily walk away. Is there anything to the, you know, the movement forward? Like they sort of, they're trying to get to, I'm trying to try to get this distinction. Like what does it mean to restrain? What does it mean to disperse? And in this case sort of seems to challenge that a little bit because they want him to leave, but he's moving forward. So there's a little bit of a, I guess some of our cases have said repel. But I don't know if that's similar to restrain or not. And so I, and maybe I've asked the question too long and you've answered as much as you have. But I'm trying to sort through the facts here. No, you've given me a chance to talk about something that I was hoping to get the chance to talk about, which is sort of where the law is on this, which is if you look at the Nelson case in the Ninth Circuit, and that case in 2004 says it's already clearly established that the intentional application of force to restrain in the sense of repel or actually just apply force is a seizure. So very, very broad understanding of what it means. So that would, this case would obviously come in under the Nelson test. I think if Packard is using a similar test, this Court's Dundon opinion really shows a different reading or understanding of restraint. I mean, it says disperse or repel in Dundon. So those are lumped together as similar to one another. It's a distinction you could understand being made, which is if I am an officer and I am pushing or I'm using some method of truly area denial that is just to repel, that may not be a seizure. It's going to depend on the context and the circumstances under the intent to restrain standard. You know, if you think about pepper spray or tear gas in the Ninth Circuit, the use of those can constitute a seizure. I think under Dundon that if you're using pepper spray to just repel, as in get people to go away because they don't want to be in that area, in this Circuit that is not the law, or at least not clearly established as the law. I think it may be the better reading of Torres v. Madrid. You know, Torres v. Madrid almost reserves this question. It says that we are only speaking of intent to restrain and not the application of force for other purposes. So it's literally reserved. And they even use the word apprehend. And they use the word apprehend. another nuance to it. And maybe they're just speaking to the specifics of that case, of Torres. I'm not sure, but it's challenging my understanding of restraint. Well, especially because I think the facts of Torres, and, you know, I've caught some flack for saying this, but I think the facts of Torres are pretty close to this case in the following sense. You have these officers approach this vehicle in Torres v. Madrid, and the person in the vehicle believes that they're going to be carjacked and just hits the gas and goes away. And they just pull their service weapons out and start shooting. And the person gets away. And it just happens to be struck by a bullet. And that case is an intent to restrain case where there is a seizure by the strike of the bullet against the driver. And so you have to sort of make, I guess, the inference that by using guns, they must have meant to stop this person to restrain them, in the sense of go and get them. But it's not clear in Torres whether they were maybe trying to do it to actually prevent just the person from advancing or restrain their movement. So yes. Oh, and I'm into my rebuttal time. I'm well into it. So I'll reserve the remainder. Thank you, Your Honor. Thank you. Ms. Engelkar? May it please the Court, Counsel. My name is Stephanie Engelkar. I represent the Appellees Sergeant Dustin Miller in Wright County in this case. I'm going to try to address some of the questions that have come up from the Court. But bottom line, we're asking the Court to affirm the District Court's well-reasoned opinion here. First of all, the conundrum of deadly force or not definitely was one that the District Court has addressed. It's a question that comes up with the various platforms that law enforcement use and that are developed. And Cujah v. City of Minnetonka, as well as the Ninth Circuit case Veracruz v. City of Escondido, addressed by the Court. So this would be at the addendum 38 through 39, can give guidance. But it's the Court's own precedent of Cujah v. City of Minnetonka that just because a platform, a weapons platform, can cause serious injury does not mean that as a matter of law it's deadly force. I would agree with that, Counsel. But here the allegation is that we have multiple pepper balls shot directly at his head. So is that deadly force? One shot. No, it's not. Pepper ball is nonlethal force, by the way. As is shown in the record, the pepper ball, like a paintball, like a water balloon, bursts on an impact and releases an irritant powder. And it's what's inside that's important. The irritant powder is released to try to create the snowman's land, this area of denial that nobody wants to be in. However, it's not effective when people have gas masks on. So is that a distinction from our Marks case, then, in terms of whether it's deadly force because of the type of munition? So, well, a few things on Marks. There were unique circumstances and facts in that case that make that distinguishable from this. We still, as of yesterday, don't know whether the Supreme Court has accepted the petition on that. So it went to the bench conference in March. So there's some uncertainty on what will happen with that. But it is distinguishable there in many ways of the officer's testimony about the use of deploying the 40 millimeter to defend the other officer. It was stopping that conduct of that specific individual. I'm, you know, I guess I'm not here to say that that was a seizure either. But certainly these facts here are more closer to Dundon versus Kirchmeier. Well, in Marks, the projectile was from 5 to 10 feet. I tried in the record to figure out how far away this was because he's at the first fence right when hit. So there are three strikes. The first strike when he's dropping down from the outer fence was to, he says, to his arm. So there's arm, goggles, top of the head. There's not three shots to the head. So arm, obviously not a use of deadly force. That's at the outer fence. Then he says, and none of, frankly, that might be the only one that arguably is caught on video. While we dispute that he was ever hit in the head, we're here on that and we'll accept it for purposes of today. Hit in the goggles. And then he says he was hit on the top of the head when he's laying on the berm. Okay, but now I was asking distance. Because if you look at these cases, there is a big fact of distance here whether you're at 5 feet hitting somebody, which all kinds of projectiles at that are pretty accurate and harmful. I'll try to find a neutral word I made up. As opposed to when you're 60, 70 feet away as we are in another case here. But this one I couldn't find the feet on. Is there any evidence about how far these fences were apart? You can kind of tell with the people lying down and figuring they're 5'5", 5'6", but it's at an angle. Is there any evidence in the record about how far it is between these fences? No, Your Honor. I don't think we have that in the record of the distance. So it would be just a, you know, I think the court can take some notice in looking at just proportionately the size of, there's squad vehicles and other vehicles in the video that at the beginning of the Pennington County video that looks around to kind of make that observation. So pepper ball can, I'd have to double check my table of contents if we have the spec sheet in the record. But I believe it was testified to as well by the deputies. Pepper ball can be used at close range, up to 5 feet. That's different than, so a bean bag round, I've had a trial actually with Judge Menendez on this issue. Vandenbahn v. Anderson would be an unpublished case in the District of Minnesota about close range, arguable close range. Ultimately the jury determined that was not at close range, but it was in dispute. So depending on the platform, weapons platform, you're correct. Distance can matter if it's close range or not. And that might be a way also to distinguish the Marks case, that that was at a close range, but was a 40 millimeter versus pepper ball. But we even know how close the officer was, and the officer's behind the second fence, right? Right. By definition, right? Yes. Okay. Do we have any testimony about how close the officer was to the second fence? Or anything from the record, I don't mean. No testimony, just video. And in our briefing we have some still shots. He's very close because they need to get those through the fence, otherwise they'll burst on the fence. Right. And impact, you know, the officers instead of getting through to the- So they're at the second fence, or close to the second fence. Yes. Okay, good. Yes. Why wouldn't, I'd like to talk about the intent to restrain on this one as well. Even if you say that initially some of this conduct on the part of officers was to disperse, and if you look at the manifestation of the objective intent, people are leaving. There's a bunch of people that go back over the first fence. And then it's pretty clear that some are remaining in the no man's land or continuing to come. Does that fact change this scenario? In other words, you've already got the dispersal attempts. But now, people, you're trespassing. The next time we use force, that looks more likely, looks more like an intent to restrain than the same use of force that was used that got people to run. Is that a distinction here that we can grapple with? I don't think you have to grapple with it because Sergeant Miller is the only individual named here. And for under Wilson versus Northcutt, you look at that individual officer and what his conduct was in the Fourth Amendment claim against him. So there's kind of, there's the use of force to disperse. And then you're correct, there's kind of some, you know, nothing happening as much. I don't want to necessarily say that the trespassers are just hanging out, but they are a bit comfortable on the berm for a while. And at some point then, I think it's 35 minutes later that there is the first arrest that's happening. And at that point, yes, when certainly when there are a few individuals that kind of voluntarily give themselves up over the inner fence, of course they're being seized. And then when the officers go under the fence, I'm sorry, come through onto the berm, of course now there's this mass arrest happening without even physical force at that point. But there's now when Holloman is being grabbed by a different officer, certainly there is an objective intent to restrain their. Yeah, and I guess I was wondering if the first, if the shooting to the head, that hit him in the head because it kind of comes after a bunch of people have already left, right, sort of the dispersal, but obviously before the arrest. And I just wondered if that made it look more like an intent to restrain at that point when they're, as you say, or not saying, hanging out in the berm. Under the facts in this record from Holloman's own testimony, no. So one of the important facts is when he says that he thinks he lost consciousness. You might think, okay, it was when you say you got hit to the head, but no. He thinks it's when he gets hit by a ladder, which I think you can see on video, but we're not the fact finders. He didn't sue the deputy that was ultimately putting him in zip ties and pushing the ladder away, but he's underneath this ladder. He says that's when he lost consciousness. He also testifies about not really realizing he was hit until somebody pointed out that there's powder on his hat. So there's not an objective intent to restrain here. Rather, the court can look at, again, it's very similar to the court's precedent in Dundon versus Kirchmeier, which is not inconsistent with Torah's. I think they marry well together in that this court's precedent in Dundon fits into Torah's pointing out use of force for other purposes. So, counsel, as specifically as you can, can you describe the purpose for the force that was used by your client against Mr. Holliman? Yes, Your Honor. As the record shows, Sergeant Miller's purpose in using the pepper ball was to disperse the entire crowd coming over the fence to get them back over the fence. They were trespassing. This was a use of force to get them back over. The reason I ask the question is where's the line then between that and restraining his movement? In restraining his movement? In trying to restrain him from coming over the fence. I guess if we're characterizing it as trying to restrain him from coming over the fence, it's a play on words because there's still that freedom to go right back over and carry on and protest where they could be protesting. As soon as they come over that fence, they're trespassing. It's felony trespass. The officers don't know if they have weapons. Now, that gets into the objective reasonableness considerations. But for the seizure— It seems that at some point there's kind of a gray area between disperse and restrain movement. In this case, yes, there is a gray area. But it's after Sergeant Miller is done. It's after he's done with this plaintiff. He's done firing the pepper ball within four and a half minutes and then switches to the OC spray to also try to disperse. So the gray area has nothing to do with Sergeant Miller. Had there been other defendants named, then there would certainly be that question that we'd need to address of where do we deem to draw the line. But we don't need to do that. Now, the court with qualified immunity in grappling with the question on deadly force or not, the court can choose to rule as a matter of law that it is. The court can choose to rule as a matter of law that this was a seizure. But it was not clearly established that it was a seizure. And it was not clearly established that it was a use of deadly force. Can I ask you a question? You said there might be other plaintiffs that were there that might kind of walk into that gray area that Judge Gross talked about. Is that because they were moving forward in a way that Mr. Holloman was not? Oh, I'm sorry. I may have misspoke, but I was talking about the other officers. Because Mr. Holloman, about 50 minutes after the pepper ball has been used, is finally arrested. And he then tries to flee arrest. So there were a few uses of force with him, but by other individuals. And he didn't sue them. When we were talking about sort of that gray area between sort of restraining, pushing back from someone who is engaging in sort of conduct towards you versus just a dispersal of a crowd, I thought you were saying that there was a plaintiff there that perhaps there would be another person on the berm who might land in that gray area a little bit more safely. I think later on in the video, I think we can agree that there's objective intent to restrain, you know, probably all 16 people once those officers are going in, and certainly when they're grabbing them to put them in the zip ties. So we would ask the court to affirm the district court's order. And then I just want to touch on with the official capacity claim. The only place that that is is in the caption here. There is no Monell claim. There's no City of Canton claim that was pled. And as this court knows, if we're going with the course of proceedings test in this circuit now, it's fair game on all. Now, what were you holding up and saying it's only in the caption? I'm sorry. The official capacity claim is only in the caption. And under the course of proceedings, there was no official capacity claim against the county here. Are you talking about the complaint, the second amendment complaint?  It's at the bottom of the same page, too, you know, where they describe Plainy was suing him in his official and individual capacities. Yes, I'm sorry. It's twice on the first page. But no claims. So the district court correctly dismissed all of the claims, all of the federal claims. I thought you were holding up the same page I had. Go ahead. Yes, thank you. Thank you. Mr. Tutt. Thank you, Your Honor. I have time to make one point. And it's just about the guidance that we would hope that the panel would give in this circumstance. These cases continue to arise. We discuss them at length in our briefing. And the question that I think the panel obviously needs to grapple with, not only the gray but also how to formulate a rule that is going to be reasonably clear to people who wish to engage in civil disobedience or protest and officers who are going to be engaging with them in those circumstances. It just cannot be the case, as Judge Schultz pointed out, and I think other circuits have recognized, that these very, very dangerous weapons should be used in routine or crowd control contexts. Now, if officers are in danger, if people are in danger, if there are circumstances that warrant this, then it's going to be a reasonable restraint. It's going to be a reasonable use of force. But in a context like this one where the officers ultimately just wanted to prevent a very laborious effort to get the protesters to leave, it should not have been used. We urge you to reverse. Thank you, Your Honor. Thank both counsel for their argument. Case number 24-2795 is submitted for decision by the Court. Ms. O'Keefe. The next case for oral argument, Raven-Bartz v. City of Minneapolis et al. Raven-Bartz v. City of Minneapolis et al.